# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS
# WESTERN DIVISION

| | | |
|---|---|---|
| Sun Life Assurance Company of Canada, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 17 C 06588 |
| v. | ) | |
| | ) | Hon. Philip G. Reinhard |
| Wells Fargo Bank, N.A., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

For the reasons stated below, the Bank's motion [147] for summary judgment is denied. Nelsen's motion [167] for summary judgment is denied. Plaintiff's motion [156] for summary judgment is granted as to Counts I and II of its complaint and Counts I and II of the Bank's counterclaim and denied as to Count IV of the Bank's counterclaim as to its claim for restitution of premiums paid on behalf of Vida Capital and otherwise granted as to Count IV of the Bank's counterclaim. Thus, the matters remaining in the case are: 1) plaintiff's claims against Nelsen (Counts III, IV, V and VI of plaintiff's complaint) and 2) the Bank's counterclaim for restitution of premiums paid on behalf of Vida Capital (CC Count IV).

## STATEMENT-OPINION

Plaintiff, Sun Life Assurance Company of Canada (a Canadian corporation with its principal place of business in Massachusetts), brings this action against Wells Fargo Bank, N.A., as securities intermediary ("Bank") (a national banking association with its main office as designated in its articles of association in South Dakota), and Frank Nelsen. Nelsen is an Illinois citizen. The amount in controversy exceeds $75,000. Subject matter jurisdiction is based on diversity of citizenship. 28 U.S.C. § 1332(a)(1) & (2).

Counts I and II of the complaint are brought against the Bank under the Declaratory Judgment Act (28 U.S.C. § 2201) and ask the court to declare that a certain life insurance policy ("Policy") issued by plaintiff on the life of Robert Corwell ("Corwell") was void ab initio as an illegal wager on human life (Count I) and lacked an insurable interest (Count II). It also seeks to recover from Nelsen, an Illinois insurance producer, who was appointed by plaintiff to sell its insurance policies, for fraudulent inducement (Count III), fraud (Count IV), negligent misrepresentation (Count V), and breach of contract (Count VI).

The Bank filed a counterclaim which was dismissed in part. The Bank's remaining claims under the counterclaims are for breach of contract (CC Count I), a statutory claim under 215 ILCS 5/155 for a vexatious and unreasonable delay in paying a claim (CC Count II), and a

1

claim for restitution of premiums paid by the Bank under an unjust enrichment theory (CC Count IV).

Plaintiff moves [156] for summary judgment in its favor on Counts I and II of its complaint and against the Bank on the claims remaining in the Bank's counterclaim. The Bank moves [147] for summary judgment in its favor on CC Count I and CC Count II. Nelsen moves [167] for summary judgment on all plaintiff's claims against him and joins the Bank's motion [147] for summary judgment in the Bank's favor.

**Overview**

Under Illinois law[1], a person or entity with an insurable interest in the life of the insured may purchase a life insurance policy from a life insurance company on the life of the insured. Ohio Nat'l Life Assur. Corp. v. Davis, 803 F.3d 904, 908 (7th Cir. 2015). A person who does not have such an insurable interest may not. Id. One has an insurable interest in an insured if one has an interest in the continued life of the insured rather than in his early death. Id. An insurance policy may be purchased from an insurance company by a person to insure the person's own life and that policy may name any person or entity as a beneficiary even though the designated beneficiary does not have an insurable interest in the insured. Id.; Hawley v. Aetna Life Ins. Co., 125 N.E. 707, 708 (Ill. 1919).

Once validly procured from the insurance company, the policy (including the right to designate beneficiaries) thereafter may be sold by the original owner to one who does not have an insurable interest in the insured. Davis, 803 F.3d at 908; Hawley, 125 N.E. at 709 ("We see no reasonable basis for public policy forbidding the owner of the insurance policy to sell it and assign it to anyone who would pay more than the cash surrender value which the company was willing to pay.") "The true line of distinction is the activity and responsibility of the assured and not the interest of the person entitled to the funds." Hawley, 125 N.E. at 708 (quotation marks and citation omitted). Every validly issued life insurance policy therefore gives the initial owner the right to name beneficiaries without regard to the beneficiaries having an insurable interest in the insured as well as the option (1) to maintain the policy in force by continuing to pay the premiums throughout the policy's term, (2) to sell the policy to a third party thereby turning the present value of the policy into cash, (3) to surrender the policy to the insurance company for its contractually established cash value, or (4) to cease paying the premiums and have the policy lapse.

If a contract expressly contravenes the law or known public policy of Illinois, the contract is void at its inception (ab initio). In re Marriage of Newton, 955 N.E.2d 572, 584 (Ill. App. 2011). If a person without an insurable interest in the life of the insured is the initial purchaser of a life insurance policy from a life insurance company on the life of the insured, then that policy is void ab initio, Charbonnier v. Chicago Nat'l Life Ins. Co., 266 Ill. App. 412 (1932), because the life insurance contract is, in effect, a wager on the life of the insured by a stranger. Davis, 803 F.3d at 909. Such a policy is commonly called "STOLI" an acronym for "stranger-

---

[1] Since the issuance of the Policy, Illinois has enacted the Viatical Settlements Act of 2009 (215 ILCS 159/1 et seq.) but this statute does not apply to this case. See Ohio Nat'l Life Assur. Corp. v. Davis, 803 F.3d 904 (7th Cir. 2015).

2

originated life insurance". Id., at 905.  Wagering by a stranger on when a person will die contravenes public policy because it is viewed as both unseemly and as providing an incentive for foul play to hasten the demise of the insured. Id., at 908.

A contract that is void ab initio "is treated as though it never existed; neither party can choose to ratify the contract by simply waiving its right to assert the defect." Newton, 955 N.E.2d at 584. The result of a life insurance policy being found void ab initio (as with any illegal contract) is that the court "leaves the parties as it found them" meaning that the insurance company keeps all the premiums paid to it and is not obliged to pay the death benefit. Davis, 803 F.3d at 911.

Illinois law provides that all insurance policies must contain a "provision that the policy, together with the application therefor . . . shall constitute the entire contract between the parties and that after it has been in force during the lifetime of the insured a specified time, not later than two years from its date, it shall be incontestable." 215 ILCS 5/224(1)(c).  The purpose of this incontestability provision is "to force an insurer to investigate any potential misstatements in the insurance application with reasonable promptness." Amica Life Ins. Co. v. Barbor, 488 F. Supp. 2d 750, 758 (N.D. Ill. 2007).

However, the public policy against wagering on a life by a stranger overrides the public policy, embodied in 215 ILCS 5/224(1)(c), to force insurers to investigate any potential misstatements in an application promptly.  A policy may be challenged as void ab initio even though the statutorily required time limit set forth in the policy for contesting it has passed. Charbonnier, 266 Ill. App. at 421-22.  The insurer may wait until it receives a claim after the insured's death before investigating whether the policy was procured by one with an insurable interest or not.

Life insurance policies possess the ordinary characteristics of property. Hawley, 125 N.E. at 708, citing Grigsby v. Russell, 222 U.S. 149 (1919).  As such, a life insurance policy may be pledged as collateral for a loan. 215 ILCS 5/245.1; Cincinnati Life Ins. Co. v. Beyer, 722 F.3d 939, 952 (7th Cir. 2013).

With that sketch of the applicable law, here is a brief overview of the facts.  Plaintiff issued a policy on the life of Corwell listing Corwell as the owner.  Shortly after issuance, Corwell transferred ownership of the policy to a trust.  From its issuance, the funds to pay the premiums on the policy came from the proceeds of a nonrecourse premium finance loan arranged and serviced by Coventry Capital I, LLC ("Coventry Capital").  The lender was LaSalle Bank ("LaSalle").  The premiums continued to be paid with proceeds from the premium finance loan until the policy was relinquished (approximately 32 months after its issuance) by the trust to Coventry Capital (as servicing agent for the premium finance lender) in full satisfaction of the outstanding premium finance loan which was about to mature.  Approximately four months later, the policy was sold by the premium finance lender to Coventry First LLC ("Coventry First") which then transferred it to the Bank as securities intermediary for AIG Life Settlements, LLC ("AIG"), which became the beneficial owner of the Policy.  The Bank then made the premium payments on the policy until Corwell's death eight years later.  After Corwell's death, the Bank filed a claim for the death benefit.  After receiving the claim, plaintiff filed this case. Plaintiff has

not paid the death benefit because it contends the true owner of the policy at the time it was issued lacked an insurable interest in Corwell's life rendering the policy void ab initio. Plaintiff maintains Coventry[2], not Corwell, was the actual owner of the Policy at its inception.

**Origination Agreements and Finance Program**

Coventry First and AIG, entered two similar agreements, each designated a "Life Policies Origination Agreement", one dated as of June 29, 2006 and the other dated as of July 1, 2008[3]. Under these agreements, Coventry First was designated as originator and seller and AIG was designated as purchaser. These agreements required Coventry First to sell and AIG to buy any life insurance policy Coventry First originated where the policy met certain specified eligibility criteria. These eligibility criteria included that the insured needed to be sixty years or older with a life expectancy of more than 25 and less than 180 months with a 10% or less probability of outliving that life expectancy. The policy needed to be beyond the applicable contestability period, could not cause AIG's aggregate investment in any given insured to exceed $10 million, and the probabilistic monetary yield to AIG from the death benefit needed to be at least 10% after taking into consideration AIG's acquisition costs and projected monthly premiums and expenses. Coventry First "originated" life insurance policies to sell to AIG under these agreements by purchasing existing life insurance policies from existing policy owners.

Coventry Capital and LaSalle Bank established a program through which prospective purchasers of life insurance could finance the premiums to acquire life insurance policies from insurers. They did so by entering an agreement under which Coventry Capital served as the program administrator for a premium finance loan program through which LaSalle made loans to finance the payment of life insurance policy premiums. LaSalle then entered another agreement, a Master Participation Agreement, with PFP Funding I, LLC ("PFP Funding"). Under the Master Participation Agreement, PFP Funding purchased from LaSalle a "100% undivided beneficial ownership interest" in premium finance loans LaSalle had made. This made PFP Funding the beneficial owner of the premium finance loans Coventry Capital was servicing for LaSalle. PFP Funding, Coventry First, and Coventry Capital (collectively "Coventry Entities") had a common ownership.

Nelsen learned about this premium finance program when he attended a presentation at a sales meeting around 2003 sponsored by Highland Capital. Nelsen entered a Producer Agreement dated January 11, 2006, with Coventry Capital in which he agreed to identify and submit to Coventry Capital life insurance policy owners seeking financing "which is directly or indirectly collateralized in whole or in part by the market or future value of the life insurance policy." Where policies were ultimately issued and financed through the program, Coventry Capital and Nelsen agreed to split commissions received from the insurer.

---

[2] Plaintiff uses "Coventry" without distinguishing among the various commonly owned entities involved in the transactions involved in this case. Nelsen likewise uses "Coventry" in his deposition testimony without distinguishing among the entities. The court will use "Coventry" when it is not clear from the record which of these entities is involved or referenced.

[3] U.S. Bank was designated as fiscal agent under the June 29, 2006 agreement. The Bank (Wells Fargo) was designated as fiscal agent under the July 1, 2008 agreement.

The program provided nonrecourse premium finance loans. When a nonrecourse premium finance loan came due, the borrower had three available options: (1) pay off the loan, retain the policy, and pay the premiums to keep it in force; (2) relinquish the policy to the lender in satisfaction of the debt; or (3) sell the policy to a purchaser willing to pay more than the outstanding loan balance and, thus, provide a gain to the selling policy owner.

It is evident that the Coventry Capital/LaSalle premium finance program was designed to foster the issuance of insurance policies which would qualify after the expiration of a policy's contestability period for origination/sale by Coventry First to AIG under the Life Policies Origination Agreements noted above. Coventry Capital enlisted insurance producers to find people who could qualify for high death-benefit life insurance policies and direct them to the program where they could obtain nonrecourse financing to acquire and maintain insurance for a couple years before selling the policies, relinquishing them to the lender for eventual sale to AIG, or using other means to pay the premiums and maintain the policies.

**Corwell, the Finance Program, and the Policy**

Through Nelsen, Corwell learned of this opportunity to obtain insurance on his life with an eye toward selling the policy for a profit (after paying off the nonrecourse loan) either on the open market or to Coventry First two years after issuance of the policy. Corwell understood if he died prior to selling the policy his beneficiaries would receive a substantial death benefit (the face value less the outstanding loan) and that if he failed to sell the policy his worst case was relinquishment of the policy to Coventry Capital/LaSalle to satisfy the loan after having "free" life insurance for two years. Corwell took advantage of the opportunity. Corwell used nonrecourse premium financing in 2005 to obtain issuance of a $5.5 million policy on his life from Security Life of Denver. Nelsen was the writing agent on this policy. The financing was provided by LaSalle through the Coventry Capital/LaSalle premium finance program. Corwell sold this policy in 2007 to Coventry for a gain of $178,416.22 over the balance on the premium finance loan.

In 2006, Nelsen submitted to plaintiff an application for a $5 million policy on Corwell's life. Plaintiff received the application on May 31, 2006. Corwell was listed as the proposed owner and the proposed beneficiary was the Corwell Family Limited Partnership ("Partnership"). The application form required the applicant to list other insurance in force. The application, as submitted by Nelsen, did not include the Security Life of Denver policy. The application listed the purpose of the insurance as estate planning.

As part of the application process, Nelsen submitted to plaintiff a worksheet required by plaintiff to determine the source of premium payments. The worksheet was dated July 14, 2006. On the worksheet, Nelsen checked the box for "individual check" as the source of premiums. He did not check the box for "premium financing". Had he checked the premium financing box, he would have been required to answer several questions including why premium financing was being used, who was providing the financing, and whether it was nonrecourse financing. The form stated: "If non-recourse is checked, do not submit this application." The worksheet also asked if premiums were not to be financed at policy issuance, if they would be financed in the

future. Nelsen checked "No" in answer to this question. The form explicitly stated: "Sun Life does not accept applications where nonrecourse financing is utilized."

Subsequently, on August 10, 2006, plaintiff issued the Policy on Corwell's life based on the application. The Policy death benefit was $5 million. The Policy listed Corwell as the sole owner of the Policy and the Partnership as the sole beneficiary.

After the application had been submitted, but prior to the Policy's issuance, Coventry Capital sent a letter dated July 31, 2006 to Corwell in which it noted the Policy was to be initially financed by a loan Corwell was procuring pursuant to the premium finance program Coventry Capital was administering on behalf of LaSalle. The letter stated that if Corwell paid the minimum premium amount ($147,059.49) to put the policy in force, LaSalle would reimburse this sum from the proceeds of the loan immediately upon acknowledgment from plaintiff that a collateral assignment of the Policy has been recorded in favor of LaSalle. The minimum premium was paid with a check drawn on an account of the Partnership.

A collateral assignment of the Policy to LaSalle, bearing Corwell's signature, was in Coventry Capital's possession by August 2, 2006, in advance of the Policy's issuance on August 10, 2006. Consistent with the non-recourse nature of the loan to be made to Corwell, the collateral assignment provided that Corwell could fully satisfy his loan obligations by transferring the Policy to LaSalle. However, the loan to Corwell secured by the collateral assignment never occurred.

**Trust and Sub-Trust**

In September 2006, Corwell assigned the ownership interest as well as the beneficial interest in the Policy to the Robert M. Corwell 2006 Insurance Trust ("Trust"). The Trust was created by a trust agreement dated as of September 26, 2006 ("Trust Agreement"). The Trust Agreement identified Corwell as the Settlor and his then wife, Diane Corwell ("Diane"), as the sole beneficiary ("Beneficial Owner") of the Trust. NatCity Trust Company ("NatCity") was identified as Trustee and Diane was identified as Co-Trustee of the Trust. The Trust Agreement provided that "the Trustee shall perform all of its duties hereunder and exercise all of its powers hereunder solely at the direction of the Settlor or following the Settlor's death, at the direction of the Beneficial Owner."

In a "Supplement to Trust Agreement" dated as of September 27, 2006, a sub-trust of the Trust was created entitled the Robert M. Corwell 2006 Insurance Trust, Premium Finance Sub-Trust ("Sub-Trust"). In this document, Corwell, as Settlor of the Trust, directed the Trustee to establish the Sub-Trust, to cause the Sub-Trust to enter a loan agreement with LaSalle to borrow money to pay the premiums on the Policy, and to have the Sub-Trust hold the Policy as collateral for such loan until repaid. The Sub-Trust provided that while the loan was outstanding the Trustee would perform its duties under the Sub-Trust solely at the direction of LaSalle except that Corwell, as Settlor, retained the power to direct the Trustee at any time on or before the loan's maturity date to relinquish the Policy to LaSalle in satisfaction of the debt. In a document entitled "Settlor and Co-Trustee Disclosure Statement and Acknowledgement" Corwell, as Settlor, and Diane, as Co-Trustee, acknowledged "that the Trust Agreement and the Supplement

to Trust Agreement are not intended to satisfy Settlor's estate planning needs and have not been designed as an estate planning tool."

**The Loan**

On October 31, 2006, the Sub-Trust and LaSalle entered into a note and security agreement ("Loan Agreement") for LaSalle to provide premium financing to the Sub-Trust to pay the Policy premiums.[4] The Loan Agreement gave LaSalle a security interest in the Policy and the Policy proceeds. The loan was non-recourse. Subsequently, Bank of America, N.A., succeeded via merger to the interests of LaSalle. Corwell executed a document entitled "Insured's Authorization to Release Medical Records and Special Irrevocable Durable Power of Attorney" ("Power of Attorney"). The Power of Attorney appointed Coventry Capital as Corwell's attorney-in-fact for the purpose of authorizing the release of Corwell's medical records and "originating and/or servicing any life insurance policies insuring [Corwell's] life."

The September 2006 change in plan—from Corwell owning the Policy (and collaterally assigning it to LaSalle) to using instead the Trust and Loan Agreement structure—was made because Coventry Capital personnel did not believe plaintiff would acknowledge the collateral assignment to LaSalle. In March 2006, plaintiff had decided no longer to issue life insurance policies where the premium payments were funded by nonrecourse loans. Nelsen testified in his deposition that the decision to change ownership of the policy from Corwell to the trust was required by Coventry[5] and LaSalle.

Coventry Capital sent a letter dated September 20, 2006 addressed to Corwell enclosing the documents that needed to be executed to create the Trust and obtain financing to pay the premiums for the Policy. The letter begins:

> "Coventry Capital, as administrator (the 'Program Administrator'), is pleased to confirm that LaSalle Bank National Association, Chicago, Illinois ('Lender') is prepared to extend a loan ('Loan') to the trust to be created by you as the settlor ('Settlor') pursuant to the enclosed trust documents, subject to each of the terms and conditions contained in the enclosed documents. The Loan would be made to fund the premium payment to be made on certain life insurance policies ('Policies') under the PFP Program administered for Lender by Program Administrator. Enclosed please find the information needed to enter into the PFP transaction. There are specific instructions for each document enclosed and for each document that you must provide. Please follow the instructions carefully."

---

[4] The Loan Agreement [Dkt # 164-6, p. 69-77] per Nelsen's deposition testimony [Dkt # 164-6, p.429 (Dep. p. 303) bears Corwell's signature on the line provided for the trustee of the Sub-Trust (NatCity) to sign. In its response [Dkt # 183] to plaintiff' statement of facts, Bank states Diane signed the Loan Agreement as trustee [Dkt # 183, p. 60, response to par. 74]. However, no evidence is cited to support the claim Diane signed as trustee. Plaintiff asserts it is Corwell's signature [Dkt # 163, p. 39 par. 74] which is consistent with Nelsen's testimony. No explanation is offered as to why Corwell executed the Loan Agreement for the Sub-Trust when he was not a trustee. However, the parties do not dispute the enforceability of the Loan Agreement against the Sub-Trust. Because the Policy appears to have been the only asset in the Trust, the court will use "Trust" as including the Sub-Trust hereafter.

[5] Presumably Coventry Capital as it was the program administrator and transmitted the loan documents to Corwell.

Nelsen testified in his deposition that all the documents in the packet that accompanied this letter were drafted by Coventry (presumably Coventry Capital), that all the decisions on what to include or not to include in these documents were made by Coventry (presumably Coventry Capital), that he assisted Corwell in completing these documents, and was with Corwell when Corwell signed the documents.

On October 31, 2006, a wire transfer was sent to the Partnership to reimburse the initial $147,059.49 premium previously paid by the Partnership and plaintiff received the balance of the premium due. These payments were made from the proceeds of the LaSalle loan to the Trust. The $297,610 annual premiums continued to be paid from proceeds from the premium finance loan until the Policy was relinquished. Thereafter, the premiums were paid by the Bank until Corwell's death.

**Relinquishment, Sale, and Non-Payment of the Claim**

In September 2008, Highland Capital received an offer from Welcome Funds, Inc. to purchase the Policy for $30,000 more than the outstanding balance on the premium finance loan. Highland Capital did not communicate this offer to Nelsen or to Corwell and there is no evidence the offer was communicated to the trustee of the Trust. The offer expired.

On February 16, 2009 and on March 16, 2009, Coventry Capital sent the Trust (at Corwell's home address) notices that the loan was coming due on its scheduled maturity date, April 30, 2009. The balance due was $569,571.60. The payment instructions included with the notices directed the funds for payment to be wired to an account belonging to PFP Funding at Bank of America. Dkt # 164-5, pp. 104-11. Also, in February 2009, Nelsen submitted an "informal application" to plaintiff for a new policy on Corwell's life.

On April 29, 2009, by a document entitled Irrevocable Settlor Instruction Letter, bearing Corwell's notarized signature, NatCity, as trustee, was directed to fully relinquish to Coventry Capital, as servicing agent for Bank of America, all the Trust's assets in satisfaction of the Trust's obligations to Bank of America under the Loan Agreement. By separate document, also dated April 29, 2009, Diane resigned as Co-Trustee of the Trust.

On August 25, 2009, by a document entitled Life Insurance Policy Purchase Agreement, Bank of America sold the Policy to Coventry First which acquired it on behalf of AIG. Dkt # 151-6, pp.40-52. The Policy was then transferred by Coventry First to the Bank as securities intermediary for AIG, which became the beneficial owner of the Policy. Bank paid the premiums on the Policy until Corwell's death on June 25, 2017 on behalf of AIG and subsequent beneficial owner of the Policy, Blackstone, and then Vida Capital which was the beneficial owner at Corwell's death. Bank submitted a claim for payment of the death benefit on August 1, 2017. Plaintiff has not paid the claim.

**The Investor Effect on Life Insurance**

Corwell was 78 when the Policy was issued in 2006 and he was 89 when he died in 2017.[6] Plaintiff received premium payments of $297,610 per year from the Policy's inception until Corwell's death. These payments were made for the first 32 months from the proceeds of the Coventry Capital/LaSalle premium finance loan to the Trust and then for the next eight years by the Bank after the Policy was acquired by Coventry First and transferred to the Bank as securities intermediary. How did this scenario, as it played out, injure plaintiff given it generated premium payments beyond Corwell's life expectancy at the Policy's inception?

Thirty-eight percent of all life insurance policies lapse from nonpayment of the premiums.[7] Susan Lorde Martin, "Betting on the Lives of Strangers: Life Settlements, STOLI, and Securitization," 13 U. Pa. J. Business Law 173, 190 (2010). However, because investors generally can afford to pay the premiums, the sale of policies to investors means those "policies will not lapse, so insurance carriers will pay death benefits on many more policies than they would be paying otherwise." Id. at 190-91. The increased payout of death benefits leads to insurers charging higher premiums in order to maintain their profit margins. This prices some people who want to buy insurance for death risk protection only out of the market. See Id. at 191.

By using the premium finance program, Corwell created a very high percentage chance plaintiff was going to be required to pay the death benefit. If he died before the loan matured, plaintiff would have to pay the death benefit to the Trust. If the Trust sold the Policy prior to the loan's maturity, the purchaser or some succeeding purchaser would likely pay the premiums until Corwell's death. If, as happened, the Trust relinquished the Policy, the lender would sell the Policy to Coventry First. Coventry First would then be obligated to sell it to AIG and AIG would be obligated to buy it under the Life Policies Origination Agreement. The Bank, serving as securities intermediary, would then pay the premiums until Corwell's death. By using nonrecourse financing through the date of sale or relinquishment, it was virtually guaranteed the Policy would not lapse from nonpayment of the premiums.

The experience with the policies Nelsen wrote on Corwell's life illustrate the preceding point. Corwell used nonrecourse loans through the Coventry Capital/LaSalle program twice. He bought the Security Life of Denver Policy and sold it to Coventry for a $178,416.22 profit. The premiums then were paid by the subsequent owners of the policy until Corwell's death when the insurer paid the $5.5 million death benefit. Corwell also bought the Policy through the program. The Policy was relinquished at loan maturity and thereafter the Bank paid the premiums on behalf of the owners until Corwell's death. Neither of the policies financed through the program lapsed for nonpayment of the premiums.

In contrast, Corwell also bought several other polices written by Nelsen financed with recourse premium finance loans from local banks. Those policies lapsed during Corwell's life for nonpayment of premiums, so no death benefit was required to be paid by the insurer.

---

[6] The life expectancy in 2006 of a 78-year old male was 8.80 more years per the Social Security Administration's table. https://www.ssa.gov/oact/STATS/table4c6_2006.html. Corwell outlived this life expectancy.
[7] This figure is from 2008. Recall the Policy was issued in 2006 and relinquished in 2009.

In sum, the transactions done **without** nonrecourse premium finance loans led to lapse in premium payment and no death benefit being paid out by the insurance company. The two transactions done **with** Coventry/LaSalle nonrecourse premium finance loans led to the payment of a death benefit claim in one case and this lawsuit contesting a filed death benefit claim in the other.

**Illinois State Cases**

No Illinois court or court applying Illinois law appears to have addressed the validity of policies financed through the Coventry/LaSalle premium finance program. The parties, therefore, seek to apply existing Illinois state court insurable interest cases, which are all 100-plus years old, to the facts of this case.

In Dresen v. Metropolitan Life Ins. Co., 195 Ill. App. 292 (1915) the insured took out a policy on her own life and named someone without an insurable interest in her life as the beneficiary. The insured paid the first three premiums and then the beneficiary made the rest. The court ruled the policy was void because a policy naming a beneficiary who has no insurable interest in the life of the insured is void as a wager policy. Id., at 294.

In Johnson v. Van Epps, 14 Ill. App. 201 (1883), aff'd 110 Ill. 551 (1884), the court upheld a policy naming a beneficiary with no insurable interest in the insured against a claim by some of insured's relatives (he had no descendants) that it was void. The beneficiary paid the premiums and provided the insured a home and care until his death.

In Bloomington Mutual Ins. Co. v. Blue, 11 N.E. 331 (Ill. 1887), the Illinois Supreme Court held valid an insurance policy payable to a beneficiary (Blue) with no insurable interest in the insured (Bailey).

In Cisna v. Sheibley, 88 Ill. App. 385 (1899), a doctor and an insurance broker entered a verbal agreement to engage in the business of procuring insurance on the lives of others. They purchased several policies on the life of Kennedy with Kennedy's wife named as beneficiary and paid the premiums until Kennedy's death. The arrangement called for ten percent of the death benefit to be paid to Kennedy's wife, ten percent to Cisna and Sheibley jointly and the remaining eighty percent to the one who furnished the money to pay the premiums and expenses. On Kennedy's death, Kennedy's widow received the agreed upon ten percent, but a dispute arose as to the distribution of the rest between Cisna and Sheibley. The court refused to enforce the agreement between Cisna and Sheibley as void against public policy as a wager on Kennedy's life. The court looked beyond the form of the transaction, holding Kennedy did not procure the insurance but rather Cisna and Sheibley did by furnishing the money to pay the premiums and soliciting Kennedy to make the application.

Hawley confirmed the holding in Blue that a person may take out a policy on his own life and make it payable to one without an insurable interest and further held that an insured may sell a policy on his own life to one without an insurable interest. Hawley, 125 N.E. at 709.

Plaintiff argues these cases require the court to find Coventry not Corwell owned the Policy at inception but none of the holdings in these cases compel that result. Johnson, Blue, and Hawley all held the policies valid. Dresen, an Illinois appellate court case, held a policy naming a beneficiary who had no insurable interest in the insured void as a wager policy. However, this holding was incorrect under the Illinois Supreme Court's holding in Blue (confirmed later in Hawley) that an insured may name a beneficiary without an insurable interest. In Cisna, the court was not faced with enforcing an insurance policy but rather an agreement between Cisna and Sheibley. It held the Cisna/Sheibley agreement unenforceable as a wager on Kennedy's life.

**Federal Diversity Cases**

Plaintiff also cites federal diversity cases applying Illinois law. In Ohio Nat'l Life Assur. Corp. v. Davis, 13 F.Supp.3d 876 (N.D. Ill. 2014), aff'd 803 F.3d 904, 908 (7th Cir. 2015), the defendants paid Bonaparte to apply for a life insurance policy. Bonaparte testified that he knew he was not actually going to receive a life insurance policy but was going to be paid "about $6,000 to $4,000" for defendants using his name to apply for the policy. Bonaparte's application was submitted to the insurer on April 26, 2007. His life insurance trust was created the next day. On June 2, 2007, Bonaparte transferred his interest in the life insurance trust to an entity owned by one of the defendants. On June 20, 2007, the insurer required a new application because the trust had been formed after the original application. Bonaparte signed a new application the same day and a policy was received by the defendants on July 5, 2007. One of the defendants paid the first premium when it came due on July 17, 2007. Also, on July 17, 2007, Bonaparte signed another document purporting to transfer his interest in the trust for $6,000.

The court found Bonaparte had sold his interest in the policy before the final application was submitted on his behalf and thus, had never owned the policy after the insurer issued it. The court found the timing of the transfer of Bonaparte's interest in the trust made clear that the defendants procured the policy with the intent of transferring it to the entity owned by one of the defendants and thus the policy was void ab initio under Illinois law. One of the defendants had argued Bonaparte procured the policy himself and had the option to keep it if he wished. The court noted "[t]his argument might have had some force if Bonaparte had ever owned the policy after Ohio National issued it." Davis, 13 F.Supp.3d at 883. In affirming, the Court of Appeals observed, citing Hawley, 125 N.E. at 708, that the case was "not one in which a policy was procured in good faith by the person himself to be assigned thereafter, but instead one in which the policy was procured by a person who had no insurable interest in the life of the person insured thus making it a wager contract." Davis, 803 F.3d at 909 (quotation marks omitted).

Davis is factually distinguishable. Bonaparte never owned the policy after its issuance. He transferred his interest in the trust set up to own the policy to an entity owned by one of the defendants before the policy was issued to the trust. Bonaparte understood when he entered the transaction that he was not going to receive an insurance policy but rather was going to be paid by defendants for the use of his name to apply for the policy. Here, the Policy was issued to Corwell who then transferred it to the Trust. Corwell was the settlor of the Trust and Diane the beneficiary until relinquishment.

11

In Lincolnway Community Bank v. Allianz Life Ins. Co. of N. Am., No. 11 C 5907, 2015 WL 7251931 (N.D. Ill. Nov. 17, 2015), Scott Veselik and William Passero set up a premium finance business. They arranged for Lincolnway to fund loans to pay premiums on life insurance policies for a 26-month period—roughly the length of the contestability period. In January 2008, Scott applied for a policy insuring the life of his father, Raymond, and listing Scott's mother, Judith as the beneficiary. On March 14, 2008, Lincolnway sent Passero loan documents and a check for $210,900 to fund the premium on the policy. Scott then wrote a personal check to the insurer in this amount to pay the premium knowing the funds from Passero and Lincolnway would be available before his check cleared. On March 17, 2008, Passero assigned the policy on Raymond's life to Lincolnway as collateral for "any and all present and future liabilities" of Passero. On August 31, 2010, Passero transferred the policy to Lincolnway. Lincolnway's executive vice president, Alexenko, testified in his deposition that Passero intended to have ownership of the policy transferred to him so he could sell it after the two-year contestability period. Lincolnway loaned the money to Passero and Passero executed the collateral assignment of the policy to Lincolnway to secure the loan. Alexenko testified there was no circumstance in which Lincolnway would accept as collateral property the borrower did not own. Alexenko was comfortable with the transaction because he knew that Passero would eventually perfect Linconway's security interest by becoming the owner of the policy. On December 29, 2008, nine months after the policy was issued, Scott filed a request with the insurer to transfer the policy to Passero. The transfer was confirmed by the insurer the next day.

The court found Passero was the owner of this policy from its inception because Passero had control over the policy and expected the policy to be transferred to him after its issuance. Since Passero lacked an insurable interest in Raymond Veselik, the court held the policy void ab initio. Lincolnway is factually distinguishable in that there Passero controlled the policy from the outset while here, under the terms of the Trust, Corwell, as settlor, controlled the Policy until he chose to relinquish it 32 months after its issuance.

**Factors in Determining Validity**

While not directly on point, the above discussed cases contain language suggesting the factors that might be considered to determine whether a policy is valid or an unlawful wager.

"The fact the plaintiff paid substantially all the premiums from the time the policy was issued and had the policy in his actual possession from about the date of its issue, may be said to demonstrate that he indirectly procured the policy to issue upon the life of the insured for his benefit." Dresen at 294.

"The question is whether the policy was in fact intended to be what it purports to be, or whether the form was adopted as a cover for a mere wager. If the plaintiff and the insured confederate together to procure a policy for the plaintiff's benefit, when he is not and does not expect to be a creditor of the insured, and with a view of having the policy assigned to him without consideration, the policy is void." Johnson at 212 (quoting a treatise, Bliss on Life Insurance).

12

"We think the better rule is, where a person obtains a policy on his life of his own accord, and pays the premium himself, he may, if he desires, make the policy payable to one who has no interest in his life." Blue at 333.

An insured may sell a policy on his own life to one without an insurable interest if "the transaction is bona fide and not intended to circumvent the law." Hawley, 125 N.E. at 709.

"[W]hen we look beyond the mere form of the transactions by which Kennedy's life was insured, he did not procure the insurance, but it was obtained by appellant and appellee, the one furnishing the money to pay the premiums and all expenses, and the other soliciting him to make the applications and attending to the details of the business." Cisna, 88 Ill. App. at 389. "Policies thus obtained were purely wager policies and the scheme, the very basis of the partnership . . . was a speculation upon life, which is against public policy and rendered the policies upon the life of Kennedy invalid." Id.

Taking the language from these cases, plaintiff distills several factors to apply to the facts to determine the true owner of the Policy at inception: 1) who controlled the transaction; 2) who paid the premiums; 3) was the Policy acquired in good faith; 4) looking beyond the form of the transaction, was Corwell merely a cover to conceal the Coventry Entities wager on his life?

**Control**

Plaintiff argues the fact Coventry Capital prepared all the documents creating the Trust and documenting the loan shows Coventry Capital controlled the entire transaction from the beginning. However, the documents creating the Trust give Corwell control of the Trust. Corwell was the Settlor and the trust agreement provided the Trustee could act "solely at the direction of the Settlor."

Corwell directed the Trustee to create the Sub-Trust in order to obtain and secure the premium finance loan. In securing the loan, the sole power to direct the Trustee was conferred on the lender while the loan was outstanding, except that Corwell retained the power to direct the Trustee to relinquish the Policy in satisfaction of the loan. Requiring a provision conferring on the lender the power to direct the Trustee during the term of the loan is a reasonable action by a lender to protect its security interest in the assets of the trust.[8]

Corwell also executed the Power of Attorney making Coventry Capital Corwell's attorney-in-fact for purposes of originating or servicing any life insurance policies insuring Corwell's life. Granting a power of attorney to a creditor to enable the creditor to deal with the collateral is common in secured transactions [9]. However, Coventry Capital did not act under the Power of Attorney either to acquire the Policy or relinquish it. Corwell transferred the Policy

---
[8] See e.g. 5 Illinois Real Property § 34:19 form: "Collateral Assignment of Beneficial Interest and Power of Direction" granting lender, along with a collateral assignment of the beneficial interest in an Illinois land trust, the sole right to direct "the acts and doings of the trustee." In an Illinois land trust the owner of the beneficial interest possesses the right to direct the trustee. Here, Corwell possessed that right as settlor under the trust documents and agreed to assigning that right to LaSalle during the pendency of the loan.
[9] See e.g. Sample Secured Loan Agreement, Sample Form 5.4, Par. 11.1 at
https://www.iicle.com/iicleonline/detail/32773

13

into the Trust and Corwell directed the Trustee to relinquish the Policy in satisfaction of the Trust's obligations under the Loan Agreement 32 months after its issuance. Coventry Capital did not control the transaction through its provision of the trust and loan documents.

**Premium Payments**

Plaintiff argues a nonrecourse loan to the insured to pay premiums on a policy on the insured's life is not a loan but a purchase of the policy by the nominal lender when the loan is secured only by the policy. Plaintiff contends that unless the borrower is obligated to repay a loan for premium financing it is not, in fact, a loan. It states in its brief in support of its summary judgment motion: "Although an insured who borrows money may be considered to have furnished the money himself, this can only be true where the loan carried 'an obligation to repay'." Dkt # 162, p. 5.

The Bank points out that this argument does not square with plaintiff's practice prior to March 27, 2006. Plaintiff does not dispute that prior to March 27, 2006, it issued policies where the premiums were paid with nonrecourse premium finance loans. It does not dispute that when it decided to stop allowing nonrecourse financing it made the change "on a going forward basis because it affected a 'significant' part of the Company's business and senior leadership wanted to provide lead time for the change in policy to take effect." Dkt # 213, p. 8. resp. to ¶ 12. According to plaintiff's current argument, it was issuing policies that lacked an insurable interest and, when it decided to stop doing so, decided to keep issuing them for a while because it affected a significant part of its business and wanted to provide lead time to adjust.

However, whether plaintiff changed its view on the propriety of nonrecourse financing or believed all along it was improper is irrelevant to whether it was, in fact, proper. If nonrecourse financing turns the lender into the buyer, and the lender has no insurable interest, the policy is still void ab initio even if the insurer knew all along it was entering an illegal contract. In an illegal contract, the nonperforming party wins because the contract cannot be enforced. Cisna, 88 Ill. App. at 394 ("The sole basis of the appellant's claim to relief, by his pleadings, is founded upon the partnership contract, which we have seen is clearly illegal and void. There is no claim that the appellant is not in pari delicto with the appellee, nor can it be said that the appellant's right to relief is unconnected with the illegal contract by virtue of which the moneys claimed to be in the hands of appellee came to him.") Full performance by one party to an illegal contract does not entitle it to performance by the other party.

Plaintiff's argument that the insured's use of nonrecourse financing means the insured does not have to repay the loan is not correct. A borrower is obligated to repay a nonrecourse loan. A nonrecourse loan limits, to the specific property pledged as security, the property of the debtor a creditor can seize to satisfy a debt if it is not paid. Nonrecourse simply means the creditor has agreed not to pursue other assets of the debtor to satisfy the debt if the proceeds the creditor receives from the sale of the pledged property are insufficient to pay the debt. See Sun Life Assurance Company of Canada v. U.S. Bank National Association, No. 14-CIV-62610, 2016 WL 161598, *16 (S.D. Fla. Jan. 14, 2016), aff'd in part, rev'd in part by 693 Fed. Appx. 838 (11th Cir. 2017) (applying Delaware law) ("Non-recourse debt simply means that the lender's remedies are limited, to wit, upon default the lender is precluded from seeking the

14

borrower's assets, with the exception of the collateral explicitly named in the loan. Contrary to Sun Life's representation, the Loan Agreement did not state that Malkin 'had no obligation to repay.'")

Nonrecourse financing is not unusual in other types of transactions—commercial real estate for example. E.g. Bank of America, N.A. v. Freed, 939 N.E.2d 509 (Ill. App. 2012). Is it barred in life insurance transactions? Plaintiff is asking the court to find that an insured can only legitimately purchase a policy on his life with borrowed funds if he exposes his assets other than the purchased policy to being taken to satisfy the debt. If he limits his exposure to the policy alone, then the party providing the nonrecourse loan is the actual purchaser and the policy is an illegal contract and therefore void. The court is unwilling to go that far. A nonrecourse premium finance loan does not in and of itself mean the lender procured the policy rather than made a legitimate loan to the purchaser to finance it. See Sun Life, 2016 WL 161598 at *16. ("While a non-recourse financing arrangement may be indicative of a STOLI plan, Sun Life provides no authority that this manner of financing is a de facto signal that the funding was obtained as part of a STOLI scheme.")

**Good Faith**

Plaintiff argues the Policy was not procured in good faith. Plaintiff had a clear policy not to issue life insurance policies where the premiums were financed with nonrecourse loans. It contends misrepresentations in the application process and the decision to use the Trust were calculated to conceal the fact the premiums were to be financed through the Coventry/LaSalle nonrecourse loan program. It also argues the application falsely stated the purpose of the insurance to be estate planning.

The application did falsely represent the purpose of the insurance to be estate planning. In the Settlor and Co-Trustee Disclosure Statement and Acknowledgement, Corwell specifically acknowledged that the Trust, which was created specifically to own the Policy, was not intended to be an estate planning tool. Corwell intended the Policy to be an investment which he hoped to sell at a profit. His testimony in his divorce case confirms his general plan to buy insurance policies on his life and try to find a buyer for them. Dkt # 164-7, pp. 410-31. He included the Policy in this discussion of the policies he bought as investments.

The application for the Policy and the worksheet submitted by Nelsen concealed both the intention to use premium financing as well as the existence of the $5.5 million Security Life of Denver policy. But for these misrepresentations, it is unlikely plaintiff would have issued the Policy. The Trust also was used to conceal the use of premium financing. The initial plan was for Corwell to procure the Policy, pay the initial minimum premium, and be reimbursed from the proceeds of the loan once plaintiff had acknowledged it had recorded the collateral assignment of the Policy in favor of LaSalle. Coventry Capital altered this plan because it did not believe plaintiff would acknowledge the collateral assignment because of plaintiff's policy not to allow nonrecourse premium financing. The Trust was set up to avoid this problem. Using the Trust allowed LaSalle to perfect a security interest in the Policy (as the only asset of the Trust) without having to obtain an acknowledgement of the security interest from plaintiff, thus not tipping plaintiff to the existence of the loan.

15

Nelsen and Coventry Capital acted to conceal Corwell's use of the premium finance program from plaintiff. What implications does this deception have for determining who owned the Policy at its inception?

In Hawley, the Illinois Supreme Court held an insured may sell his policy to one without an insurable interest. In so holding it quoted 2 Joyce on Insurance (2d Ed.) § 918: "'The weight of authority sustains the proposition that if a person effects a valid insurance upon his own life and the transaction is bona fide and not intended to circumvent the law, the assignment to another will be upheld even though the assignee has no insurable interest in the life of the insured.'" Hawley, 125 N.E. at 709. Plaintiff cites this language from Hawley and similar language from Blue 11 N.E. at 333 ("The essential thing is that the policy should be obtained in good faith, and not for the purpose of speculating on the hazard of a life in which the assured has no interest.") to argue the transaction was not bona fide or in good faith because of the concealment of the financing arrangement and the investment rather than estate planning purpose.

Buying a policy to insure one's own life with the intention of trying to sell it at a profit does not appear to violate Illinois law. Hawley allows a sale to a third party without an insurable interest at some point after a policy has been procured by the insured. There does not seem to be any reason to allow such a sale only where the insured originally intended to maintain the policy indefinitely and later decided to try to sell it because of some change in circumstances. Because investment is a lawful purpose for an insured to procure a policy on his own life, under normal circumstances, the misrepresentation in the application about this purpose would be subject to the contestability provision required by 215 ILCS 5/224(1)(c). Likewise, since use of nonrecourse financing, of itself, is lawful, under normal circumstances, misrepresentations in the application about its use to finance the Policy would also be subject to this provision.

Had Corwell purchased the Policy and paid the premiums for two years with the proceeds of a nonrecourse loan from his local bank and then sold the Policy to Coventry First and paid off the loan with the sales proceeds, the Policy would have been validly issued and validly sold to Coventry First and the misrepresentations as to purpose and financing incontestable as outside the contestability period.

**Cover for a Wager**

The final factor suggests looking beyond the form of the transaction, to see if Corwell was merely a cover to conceal the Coventry Entities wager on his life. "[C]ases in which a person having an interest lends himself to one without any, as a cloak to what is, in its inception, a wager, have no similarity to those where an honest contract is sold in good faith." Grigsby, 222 U.S. at 156. While Grigsby did not involve Illinois law, the Court of Appeals quotes this statement from Grigsby in Davis, 803 F.3d at 909 (applying Illinois law).[10] Despite the careful documentation in this transaction which placed Corwell in control of the Trust which owned the Policy, did he in fact lend himself as a cloak to a wager by the Coventry Entities on his life thus rendering the Policy void ab initio?

---

[10] More precisely, the Court of Appeals quotes PHL Variables Life Ins., Co. v. Bank of Utah, 780 F.3d 863, 867-68 (8th Cir. 2015) quoting Grigsby.

Corwell had an asset—his insurability—that Nelsen showed him how to put to work. Corwell's age, life expectancy, and prosperity made him an attractive candidate to an insurance company for a high death benefit policy on his life. His insurability, combined with a hefty infusion of cash to pay the premiums, offered an opportunity to cash in on the market value of any policy insuring his life. Because of the insurable interest requirement, the market value of his insurability was something only Corwell could exploit. The Coventry Entities provided him a cost-free way to do so. Coventry Capital administered the premium finance program with LaSalle as the lender. However, pursuant to the Master Participation Agreement, PFP Funding, one of the Coventry Entities owned 100% of the beneficial interest in the loan used to fund the premiums on the Policy. Coventry Capital, therefore, was administering the program ultimately for the benefit of another of the Coventry Entities. Coventry Capital pre-cleared the Policy for sale to Coventry First and to AIG before arranging the loan. The Policy was relinquished to Bank of America as successor by merger to LaSalle but under the terms of the Master Participation Agreement, PFP Funding was the beneficial owner of all rights in the loan and in the collateral for the loan—the Policy. Dkt # 164-5, p. 114. When the Trust relinquished the Policy to satisfy the debt, the beneficiary of the relinquishment was PFP Funding just as PFP Funding would have been the beneficiary of the payment if the loan had been paid in cash. The Policy was then sold to Coventry First with the sales proceeds payable to a PFP Funding account at Bank of America. Coventry First then sold the Policy to AIG pursuant to the Life Policies Origination Agreement.

Coventry Capital administered the loan. PFP Funding (via owning the beneficial interest in it) funded the loan, received the benefit of the relinquishment of the Policy to Bank of America, and of the subsequent sale of the Policy to Coventry First. Coventry First sold the Policy to AIG pursuant to the Life Policies Origination Agreement it had in place with AIG. Corwell contributed only his insurability. Unlike Bonaparte in <u>Davis</u>, who sold his insurability for a flat fee, Corwell sold his insurability to buy the possibility of a substantial gain depending on the market value of the Policy during the term of the loan. He, in fact, reaped such a gain ($178,416.22) in the Security Life of Denver transaction.

This upside opportunity for Corwell added a new variable to the common STOLI transaction but did not change the nature of the transaction. The process was constructed to stack the odds in favor of Coventry First ending up with the Policy and selling it to AIG. While the typical STOLI wager carries the risk the insured dies before the contestability period expires and the investor gains the policy, <u>Lincolnway</u>, 2015 WL 7251931 at *6, the Coventry Entities' program simply added an additional risk—that they might get outbid by another prospective investor. Either way, as the transaction was structured, Corwell only contributed his insurability to the transaction. In this respect he was no different than Bonaparte in <u>Davis</u>. Corwell (through the Trust) just held the Policy in the hope of realizing a market gain rather than getting paid a flat fee at the outset for his insurability.

While a nonrecourse loan is not per se unavailable for purchasing life insurance, in the circumstances here, the loan was funded by one of the Coventry Entities as a key part of the Coventry Entities' overall plan to use Corwell's insurability to create a policy eligible for sale by another of the Coventry Entities under the Life Policies Origination Agreements. The nonrecourse loan was the inducement to Corwell to contribute his insurability to the plan and

funded the wager. Looking beyond the form, this transaction was intended to circumvent the law against wagering on the life of a stranger. Hawley, 125 N.E. at 709. The Policy was void ab initio.

Because the Policy was void ab initio, plaintiff is entitled to summary judgment on Counts I and II of its complaint and on the Bank's breach of contract counterclaim (CC Count I). Because the Policy was void ab initio, plaintiff's refusal to pay the death benefit was justified, not vexatious and unreasonable, so plaintiff is also entitled to summary judgment on the Bank's statutory counterclaim under 215 ILCS 5/155 (CC Count II).

Plaintiff also seeks summary judgment on the Bank's counterclaim for restitution of premiums paid under an unjust enrichment theory (CC Count IV). "To prevail on a claim for unjust enrichment, a plaintiff must prove the defendant retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates fundamental principles of justice, equity, and good conscience." Nat'l Union Fire Ins. Co. v. DiMucci, 34 N.E.3d 1023, 1043 (Ill. App. 2005) (quotation marks and citation omitted). Under Illinois law, a party who made payments under an illegal contract may be able to recover payments made where the party is not responsible for the illegality. Davis, 803 F.3d at 911.

The Bank argues it is entitled to a return of all premiums paid by it, $1,847,313.60, plus the fair market value of the Policy prior to Corwell's death of $3,136,435.72. This would leave it $16,250.68 shy of the $5 million mark— the death benefit on the void Policy. The Bank offers no argument supporting its claim to the fair market value and no such claim is pending. The remaining counterclaim is only for restitution of premiums paid by the Bank on an unjust enrichment theory. Dkt # 64.

The Bank served as securities intermediary, initially for AIG when it acquired the Policy from Coventry First. The Bank continued to act as securities intermediary for subsequent Policy owner, Blackstone and for Vida Capital, the Policy's current beneficial owner. Prior to purchasing the Policy from Blackstone, Vida Capital conducted a due diligence review. Vida Capital was comfortable with the Coventry/LaSalle premium finance program from an insurable interest perspective and was aware plaintiff was filing lawsuits challenging some of these policies. Vida Capital knew it might be purchasing a lawsuit.

In Davis, the insurer argued Egbert "knew or should have known that he had bought an interest in a void contract" and should therefore be denied restitution of the premiums he paid. Id. The court of appeals affirmed the district court's award of restitution to Egbert and its rejection of the "knew or should have known" argument. Id., at 911-12. The district court found the fact Egbert frequently traded in the secondary life insurance market was not a reason to deny restitution as such activity is not against Illinois law. Davis, 13 F.Supp.3d at 886. It found the insurer's allegation that "Egbert did not sufficiently investigate 'whether there was an insurable interest at the time the Bonaparte Policy was issued'" was not a basis for denying him restitution. Id. The district court found that without any evidence Egbert was complicit in the program that induced the issuance of the Bonaparte policy, "there is no basis for the Court to find that it would be just for Ohio National to retain the premiums Egbert paid." Id.

There is no evidence Vida Capital was complicit in procuring the issuance of the Policy nor does plaintiff argue any such complicity. Plaintiff's argument is that Vida Capital knew or should have known, because of its due diligence review, that the Policy was void for lack of an insurable interest when it bought it. The evidence shows only that Vida Capital after its due diligence review believed the Policy to be valid but turned out to have been wrong. Because Vida Capital was not complicit in the issuance of the Policy, plaintiff is not entitled to summary judgment on the counterclaim for restitution of premiums to the extent the premiums were paid by the Bank on behalf of Vida Capital.

The Bank is also seeking restitution of premiums it paid from the time it first acquired the Policy as securities intermediary for AIG. However, Vida Capital is the current beneficial owner of the Policy and the Bank does not show why premiums paid on behalf of prior beneficial owners should be recoverable for Vida Capital. Plaintiff is entitled to summary judgment as to restitution of any premiums not paid on behalf of Vida Capital.

Nelsen also moves for summary judgment on all plaintiff's claims against him. However, he has failed to comply with LR56.1 so his motion must be denied. He has not filed a memorandum in support of his motion, nor a statement of undisputed material facts, nor any affidavits or other materials referred to in Fed. R. Civ. P. 56(e) as required by LR56.1(a)(1)-(3). Instead he incorporates the Bank's memorandum in support of its motion for summary judgment, the Bank's LR56.1 statement of facts, and the declaration and supporting exhibits of Andrew James Dykens filed in support of the Bank's summary judgment motion.

The Bank's memorandum does not address plaintiff's claims against Nelsen for fraudulent inducement (Count III), fraud (Count IV), negligent misrepresentation (Count V), and breach of contract (Count VI). Without a memorandum addressing these claims, there is simply no basis for the court to determine if "there is no genuine dispute as to any material fact and the movant [Nelsen] is entitled to judgment as a matter of law" Fed. R. Civ. P. 56(a). Nelsen has not met the movant's burden for obtaining summary judgment.

For the foregoing reasons, the Bank's motion [147] for summary judgment is denied. Nelsen's motion [167] for summary judgment is denied. Plaintiff's motion [156] for summary judgment is granted as to Counts I and II of its complaint and Counts I and II of the Bank's counterclaim and denied as to Count IV of the Bank's counterclaim as to its claim for restitution of premiums paid on behalf of Vida Capital and otherwise granted as to Count IV of the Bank's counterclaim. Thus, the matters remaining in the case are: 1) plaintiff's claims against Nelsen (Counts III, IV, V and VI of plaintiff's complaint) and 2) the Bank's counterclaim for restitution of premiums paid on behalf of Vida Capital (CC Count IV).

DATE: 3/30/2020            ENTER:

                           _____
                                  Philip G. Reinhard
                           United States District Court Judge


Electronic Notices. (LC)